**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**COLUMBUS DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 4:20-cr-32-CDL-MSH |
| | : | |
| ERICA MONTGOMERY, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

## <u>ORDER</u>

Pending before the Court are two joint motions to compel filed by Defendants Erica Montgomery, Sandra Anderson, Leo Frank Thomas, Yolanda Thomas, Kristina Parker, and Dorothy Webb ("Defendants") (ECF Nos. 105, 110).[1]  For the reasons stated below, these motions are denied.

## BACKGROUND

This case centers around Defendants' alleged activities concerning the Columbus, Georgia satellite campus of the Apex School of Theology ("Apex").  Defendants are generally alleged to have been involved to one degree or another in a scheme to falsify student admission applications, financial aid applications, and student course work in order to enroll and retain students at Apex for the purpose of fraudulently obtaining federal financial aid funds.  The grand jury returned an indictment on October 15, 2020, charging

---

[1]  It is not clear if Defendant Montgomery joins in ECF No. 110.  She is not listed as a moving party in the original motion but is listed in the supplemental submission (ECF No. 135).

Defendants with various counts of conspiracy, mail fraud, financial aid fraud, and money laundering.  Indictment, ECF No. 1.

On August 25, 2021, Defendants filed a motion to compel the Government to produce documents related to communication between prosecutors and the Federal Bureau of Investigation ("FBI") and the Department of Education ("DOE") (ECF No. 105).  The Government responded to that motion on September 16, 2021, and Defendants did not reply (ECF No. 106).

On September 22, 2021, Defendants filed another motion to compel (ECF No. 110). Primarily, this motion requests the Court to order the Government to produce prosecutors' and FBI agents' handwritten notes from witness interviews.  Defs.' 2d Mot. to Compel 15, ECF No. 110.  Additionally, Defendants request all grand jury testimony, statements made by prosecutors in the presence of the grand jury when no witnesses were present, and the prosecutors' explanation of the law to the grand jury. *Id.* at 16.  The Government responded to the motion on October 13, 2021, and Defendants replied on October 26, 2021 (ECF Nos. 116, 117).

The Court held an evidentiary hearing on the motions on January 3, 2022.  During the hearing, defense counsel agreed that he would file a supplemental motion with an "exhaustive" list of discovery items requested.  Hr'g Tr. 67:2-9, ECF No. 136.  Following the hearing, Defendants supplemented their motion to compel, specifying that they were requesting "all AUSA/DOJ Trial Attorney notes, FBI '1-A' files and notes, and any notes from any other law enforcement agent present for any interview" for sixty specifically-identified witnesses.  Defs.' Suppl. to 2d Mot. to Compel Attach. 1, ECF No. 135-1.  The

2

Government responded on January 21, 2022 (ECF No. 137).  These motions are ripe for review.

## I.     DOE Documents

Defendants move to compel production of communication and documents exchanged between prosecutors and the FBI and the DOE (ECF No. 105).  Defendants contend the Government improperly shared grand jury material with the DOE in violation of Rule 6(e) of the Federal Rules of Criminal Procedure.  Defs.' 1st Mot. to Compel 3-4, ECF No. 105.  The Government responded to the motion by attaching an order signed by Judge Treadwell that specifically allowed the disclosure of such information under Rule 6(e)(3)(F).  Gov't Resp. to Defs.' 1st Mot. to Compel Ex. 1, ECF No. 106-1.  Defendants did not reply to argue that the disclosure was not otherwise permitted and did not address the motion during the January 3, 2022, hearing.  Therefore, Defendants' first motion to compel (ECF No. 105) is **DENIED**.

## II.    Prosecutor and FBI Agent Notes

Defendants move to compel production of handwritten notes of witness interviews made by prosecutors, FBI agents, and other law enforcement agents (ECF No. 110).  A criminal defendant's right to discovery is not unlimited.  Instead, it is circumscribed by rule, statute, and case law.  Relevant to this motion, the Government is required, upon a defendant's request, to permit the defendant to

> inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and: (i) the item is material to preparing the defense; (ii) the government intends to use the item in its case-in-chief at trial; or (iii) the item

was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E).  While the first category is broadly worded, the Government is not required to produce an item "unless the defendant demonstrates that it is material to the preparation of his defense."  *United States v. Jordan*, 316 F.3d 1215, 1250 (11th Cir. 2003).  This requires a defendant to "make a specific request for the item together with an explanation of how it will be helpful to the defense."  *Id.* (internal quotation marks omitted).

The Government's discovery obligations under Rule 16(a)(1)(E) are also limited by Rule 16(a)(2) and (a)(3).  Rule 16(a)(2) bars "the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case."  Fed. R. Crim. P. 16(a)(2).  It also bars the discovery of "statements made by prospective government witnesses."  *Id.*  Rule 16(a)(3) exempts the discovery of grand jury testimony.  Fed. R. Crim. P. 16(a)(3).  However, once a witness testifies at trial on direct examination, the *Jencks Act* requires the Government to produce the witness's previous statements, including statements to a law enforcement agent or grand jury.  18 U.S.C. § 3500.

The Supreme Court has also found some pre-trial discovery to be constitutionally mandated.  This includes the production of exculpatory evidence.  *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  It also includes evidence which could impeach the credibility of a prosecution witness.  *Giglio v. United States*, 405 U.S. 150, 154 (1972).

Here, Defendants ask the Court to order the Government to produce all prosecutor and law enforcement agent notes from sixty witness interviews.  Defs.' Suppl. to 2d Mot.

4

to Compel Attach. 1.  Production of this material is not required by rule or statute.[2]  *Brady* and *Giglio* require the production of exculpatory and impeachment evidence obtained from the witness interviews, and the Government states it has provided—and will continue to provide—such information.[3]  Defs.' Hr'g Ex. 1, ECF No. 134-1; Hr'g Tr. 19:15-20:3.  Nevertheless, Defendants contend they are entitled to all of the interview notes for all of the listed witnesses whether the Government intends to call them to testify or not.  They base this on grand jury transcripts of particular witnesses they claim show a pattern of prosecutorial misconduct, including coaching and intimidating witnesses, telling the grand jury what evidence the Government possessed instead of presenting actual testimony or documentary evidence, invading the province of the grand jury, and misleading the grand jury on the law.  Defs.' Reply 2-3, ECF No. 117; Hr'g Tr. 7:20-8:11.

    Defendants first cite the grand jury testimony of A.M.A.  During his first appearance before the grand jury on July 11, 2019, A.M.A. accused the prosecutor of telling him that he could not step outside and consult with counsel.  Defs.' Ex. 1, at 3, ECF No. 110-1.  The prosecutor denied the accusation.  *Id.*  Then, when questioned about his refusal to agree to voluntary use immunity, the witness told the grand jury he was invoking his Fifth Amendment rights "because of . . . the discussion that me and [the prosecutor] had in there

---

[2]  The *Jencks Act* requires production of interview notes if they are a "substantially verbatim recital" of the witness's oral statement, but there is no indication that any of the interview notes fall into this category.  18 U.S.C. § 3500(e)(2).

[3]  According to the Government, it has produced FBI-302 interview summaries for all witnesses even if it does not intend to call them at trial.  Gov't Suppl. Resp. to 2d Mot. to Compel 6, ECF No. 137; Hr'g Tr. 72:12-14.

when he said what I was saying was bullshit." *Id.* at 5.

During his second appearance before the grand jury on August 13, 2019, A.M.A. was questioned about the Court's order compelling testimony. Defs.' Ex. 2 , at 5, ECF No. 110-2.  The witness accused the prosecutor of having gone "downstairs and told them I said I refused," when the witness had only asked for an attorney. *Id.*  A.M.A. testified that the prosecutor had responded by saying that was "bullshit." *Id.*  The prosecutor proceeded to question A.M.A., and at one point, reminded him of his obligation to tell the truth, warning him, "So I'm going to ask you questions, and I want you to be real careful about how you answer them because if you get sideways on this stuff, you know, it opens you up.  That immunity agreement no longer protects you." *Id.* at 20.  Later during his examination, the prosecutor asked the witness if it was just a coincidence that Lussius Anderson—A.M.A.'s former roommate and the son of Sandra Anderson—had submitted A.M.A.'s schoolwork via Apex's online system. *Id.* at 32-33.  Then, when asking the witness about his relationship with Sandra and Lussius Anderson, the prosecutor cautioned him, "I don't want you to get jammed up on something that is needless." *Id.* at 36.  He asked the witness if he was "sure" he had told the grand jury everything about his relationship and asked if his and Lussius Anderson's story would match if Mr. Anderson "decide[d] to cooperate." Defs.' Ex. 2, at 36.  Finally, near the end of A.M.A.'s testimony, the prosecutor asked him if he was aware that Sandra Anderson was a convicted felon. *Id.* at 48.

Defendants contend the prosecutor's comments to A.M.A. regarding the truthfulness of his testimony constituted threats. Defs.' 2d Mot. to Compel 4-5.  As for the

prosecutor's "bullshit" remark, Defendants argue that to the extent it was a comment on A.M.A.'s right to counsel, that was also prosecutorial misconduct. Defs.' Reply 3. They also assert that the prosecutor's questions premised on Lussius Anderson doing A.M.A.'s homework was a misrepresentation of fact because the Government could only show that an IP address registered to Mr. Anderson was used to submit homework, not a "MAC Address" showing the particular device used to access the internet through the router. Defs.' Suppl. to 2d Mot. to Compel. 3-4, ECF No. 135. Finally, Defendants state that reference to Sandra Anderson's conviction was improper because she was pardoned for the offense, and it would be inadmissible at trial. Defs.' 2d Mot. to Compel 6 n.5.

A.G. testified before the grand jury on February 12, 2019. A.G. was an Apex student. Defs.' Ex. 3, at 3, ECF No. 110-3. He testified that he paid Erica Montgomery out of his financial aid. *Id.* at 27-28. At one point, he testified that when he would come into the school office, the people there acted "like they already knew what was going on." *Id.* at 29. In response, the prosecutor told the witness he could "speculate a little bit here" as to whether anybody at Apex knew that Montgomery "was just running a scam with students." *Id.* The witness responded, "Definitely. Everybody knew what was going on." *Id.* When asked to explain the basis for his response, A.G. testified that it was based on the reaction of people in the office when he walked in and having been to Montgomery's house and hearing the phone calls between her and Sandra Anderson. *Id.* at 29-30.

Defendants contend the prosecutor's instruction to the witness that he could "speculate" was improper because it implied to the grand jurors that they could indict based on speculation as opposed to actual evidence. Defs.' 2d Mot. to Compel 6 n.6.

J.B. testified on August 13, 2019.  During his testimony, he was asked how he knew Erica Montgomery.  Defs.' Ex. 4, at 10, ECF No. 110-4.  The witness responded that he had "seen her face around" but that during an initial meeting with agents and the prosecutor, they "explained the whole case and the investigation and where they were going with it" and gave him "a lot of information."  *Id.*  He later testified that they told him Erica Montgomery was "recruiting people and people was paying her to do their work and all that."  *Id.* at 16.  J.B. testified that he had met Montgomery and that she had done his taxes. *Id.* at 10-11.   Then when questioning the witness about his homework found at Montgomery's tax service, the prosecutor mentioned that the immunity agreement protected J.B., but if he lied to the grand jury, he was not protected.  *Id.* at 25.  He warned the witness that this was his opportunity to "fix" anything and "start explaining" because he did not want him to "get jammed up."  *Id.*  The prosecutor then explained they had conducted a search of Montgomery's office and proceeded to summarize what had been found.  Defs.' Ex. 4, at 26.  He told the witness, "Now, listen, at some point, there's going to be an indictment in this case."  *Id.* at 26-27.  The prosecutor indicated that people were likely to "flip" and "cooperate" with the Government and that if evidence showed that the witness was not being truthful, he had "just gotten [himself] in a real big jam."  *Id.* at 27.

Near the end of J.B.'s testimony, the prosecutor asked if Erica Montgomery would be lying if she eventually agreed to cooperate and testify that the witness had been involved. *Id.* at 27-28.  In response, J.B. stated that Montgomery would be lying and further indicated that her potential cooperation could result from being offered "a cut" like the Government's offer to him that it would remove his probation if he "coincide[d] with the story that you're

8

saying now about Erica." *Id.* at 28.   Earlier, J.B. had testified that he had a felony conviction on a charge in which the prosecutor had represented the Government. *Id.* at 6. The prosecutor denied knowing anything about an offer to lift J.B.'s probation.  Defs.' Ex. 4, at 28.

Defendants argue that J.B.'s grand jury testimony proves prosecutorial misconduct because it reflects threats to prosecute the witness for perjury and to offer deals in exchange for him supporting a Government narrative.  Defs.' 2d Mot. to Compel 10, 14; Hr'g Tr. 32:4-22, 33:24-34:19.   Defendants further assert that the prosecutor's comment that "there's going to be an indictment" invaded the province of the grand jury.  Defs.' 2d Mot. to Compel. 9.  Defendants also contend that the prosecutor's "lengthy monologue" about evidence recovered in the search of Montgomery's office made the prosecutor a "key witness" before the grand jury. *Id.* at 8-9.

Defendants argue that these incidents of alleged prosecutorial misconduct are part of an effort to fabricate a narrative.  Defs.' 2d Mot. to Compel 2.  They further argue that these incidents necessitate the Court ordering production of the Government agent and prosecutor notes from sixty witness interviews or conducting an *in camera* review of the notes.  Defs.' Reply 2.  The Court disagrees that the incidents cited by Defendants justify the Court's intrusion into the discovery process.

As a preliminary matter, the Court finds nothing sinister in the fact that prosecutors and investigators met with some witnesses prior to their grand jury testimony.  It is difficult to see how an investigation of this magnitude could be efficiently conducted otherwise. Further, beginning the interviews with a summary of the investigation is a sensible method

of directing the witness's attention to the nature of the information sought.  Defendants express concern that some of these meetings are not memorialized in an FBI-302 or similar document, but there is no legal requirement that such documents be generated.  Further, if a witness refuses to provide information after listening to the investigators' presentation, then, as the Government points out, no notes would necessarily be taken.  Gov't Resp. to 2d Mot. to Compel 11, ECF No. 116; Hr'g Tr. 25:1-11.

The Court also finds no merit in Defendants' contention that the Government threatened or improperly incentivized witnesses for their testimony.  There is nothing improper about reminding a witness of his obligation to testify truthfully and the consequences for not doing so.  *See United States v. Petit Frere*, 334 F. App'x 231, 236 (11th Cir. 2009) (finding that government's email to witness's attorney warning of the consequences of untruthful testimony did not violate the defendant's due process rights).  Further, it is clear from the grand jury transcript that A.M.A. and J.B were reluctant to testify and not forthcoming about their involvement in Apex.  Under these circumstances, the prosecutor had a reasonable basis for reminding the witnesses of the consequences of perjury.  *Id.* at 237-38 (finding that the witnesses inconsistent pre-trial statements gave the government a "reasonable basis to question" whether the witness would testify truthfully).  Moreover, while the prosecutor's comment to A.M.A. about his story or request for counsel being "bullshit" was unprofessional, this burst of frustration with the witness's perceived unhelpfulness does not justify the remedy sought by Defendants.  Finally, J.B.'s reference to an offer to drop his probation is not evidence of secret agreements with witnesses, and the fact that the grand jury testimony was provided to Defendants shows transparency.  The

Court is confident the Government will continue to meet its obligations under *Giglio* as represented by Government counsel.  Gov't Suppl. Resp. to 2d Mot. to Compel 9.

The Court also disagrees that the grand jury excerpts demonstrate improper presentation of evidence.  The prosecutor's statement to A.G. that he could "speculate a little bit" did not imply to the grand jury that they could indict based on speculation.  It is clear from A.G.'s testimony as a whole that his testimony was based on his own personal knowledge.  Further, while the prosecutor did at times summarize to the grand jury evidence gathered in the case, Defendants' contention that the prosecutor became a witness as a result is misplaced.  The Court has had the benefit of reviewing grand jury testimony *in camera* and is confident that to the degree the prosecutor outlined evidence in the case, that evidence was properly submitted to the grand jury that returned the indictment.  Moreover, the prosecutor had a good faith basis for premising that Lussius Anderson had performed A.M.A.'s homework.  According to the Government, in addition to the IP address, it had evidence of a Word program registered to Mr. Anderson.  Hr'g Tr. 61:13-24.  In any event, to the extent Defendants challenge Lussius Anderson's involvement in the alleged criminal activities—and it is relevant—that is a matter to be raised at trial.  *See United States v. Kight*, No. 1:16-cr-0099-AT-LTW, 2020 WL 2050665, at *4 (N.D. Ga. Mar. 16, 2020) ("Factual disputes and defenses, including those Defendant seeks to put before the Court through the evidence attached to its Motion, should be resolved by the finder of fact." (rejecting defense request for grand jury transcripts)), *recommendation adopted by* 2020 WL 5015787 (N.D. Ga. Aug. 25, 2020).  Finally, the prosecutor's

comments that there would be an indictment did not invade the province of the grand jury.[4] *See United States v. Heffington*, 682 F.2d 1075, 1080 n.3 (11th Cir. 1982) ("Grand jurors, as a practical matter, however, are aware that a case is being presented to them because the prosecutor feels that an indictment is warranted. Thus the fact that a prosecutor conveys such an impression to the grand jury does not require the dismissal of the indictment." (quoting *United States v. Cederquist*, 641 F.2d 1347, 1353 (9th Cir. 1981))).

In summary, the Court sees no reason to alter the normal discovery rules. Defendants cite *Jordan* to argue that "*in camera* inspection of raw notes and FBI 302 reports is also required to conduct the necessary analysis pursuant to *Brady, Giglio* and [*United States v. Agurs*, 427 U.S. 97 (1976)]."[5]  Defs.' 2d Mot. to Compel 13.  But *Jordan* does not say that.  Instead, that case involved a dispute that arose after a Government witness's direct examination at trial.  Following direct examination, defense counsel asked for the investigators' raw notes of the witness's interview, contending they contained *Brady* or *Giglio* material.  *Jordan*, 316 F.3d at 1256.  As noted by the Eleventh Circuit, defense counsel's assertion was "purely" speculative since he had not seen the notes.  *Id.* Nevertheless, the district court ordered the prosecutor to produce them.  *Id.*  On review, the Eleventh Circuit reviewed the notes and concluded they contained no exculpatory or impeaching material and that the district court erred when it dismissed the indictment for

---

[4]  The Government notes that the grand jury panel that returned the indictment in this case was not the same panel before whom the prosecutor made this statement.  Gov't Resp. to 2d Mot. to Compel 12.

[5]  In *Agurs*, the Supreme Court held that the duty to disclose exculpatory material arose even without a request.  427 U.S. at 107.

12

prosecutorial misconduct. *Id.* at 1256-58. Thus, the Eleventh Circuit's review of the raw notes took place as part of the review of the district court's order. Nothing in the decision obligates district courts to conduct an *in camera* review of raw notes and FBI-302s simply because a defendant alleges prosecutorial misconduct.

Defendants also argue that *United States v. Rudolph*, 224 F.R.D. 503 (N.D. Ala. 2004) supports their position. The Court disagrees. In that case the defendant cited fifteen specific FBI-302s that the district court agreed contained "questionable inconsistencies."[6] *Id.* at 512. Further, the defendant cited a specific example of *Brady* material that was not revealed by the Government and for which the district court strongly criticized the prosecution. *Id.* at 513. The district court concluded that *in camera* review of the rough notes for the fifteen FBI-302s was warranted to determine if the FBI-302s accurately reflected the witness interviews or otherwise contained *Brady* material. *Id.* at 512-14. The district court, however, rejected the defendant's argument that the fifteen cited FBI-302s warranted *in camera* review of all of the government's rough notes of witness interviews.[7] *Id.*

Here, unlike *Rudolph*, Defendants do not cite specific internal inconsistencies

---

[6] The district court's decision did not explain the nature of the inconsistencies, *i.e.,* whether the FBI-302s were internally inconsistent, inconsistent with each other, or inconsistent with grand jury testimony.

[7] The district court agreed that in light of the inconsistencies highlighted in the fifteen examples and the government's questionable view of what constituted *Brady* material, *in camera* review was "warranted under these circumstances" to determine whether the examples were the "tip of an iceberg" of discoverable material. *Rudolph*, 224 F.R.D. at 512. Here, Defendants do not show circumstances warranting *in camera* review.

within witness statements or between witness statements that a review of agent notes might resolve or clarify.[8]   Nor do they cite any specific examples of *Brady* material that was withheld.   Instead, Defendants cherry-pick the grand jury testimony of A.M.A., A.G, and J.B. to theorize that Government agents threatened, coached, and made secret promises to witnesses and that such conduct would somehow be reflected in the agents' rough interview notes.   As discussed above, however, the grand jury testimony does not support this speculative assertion as to these three witnesses, much less provide grounds for turning over the rough notes of the other fifty-seven witness interviews.   Further, the Government has demonstrated compliance with its *Brady* and *Giglio* obligations.

## III.    Grand Jury Material

As noted previously, during the hearing on Defendants' motion to compel, defense counsel agreed that he would file a supplemental motion with an "exhaustive" list of the requested discovery items.   Hr'g Tr. 67:2-9.   Despite this, Defendants' supplemental motion to compel contains a cursory request that the Court order "the production of the documents and files requested in the initial Motion, or in the alternative require that the Government produce them for *in camera* inspection."   Defs.' Suppl. to 2d Mot. to Compel 4, ECF No. 135. In their initial motion, Defendants requested all grand jury testimony,

---

[8]  Defendants argue that "the AUSA in charge of the grand jury has indicated in the transcripts that he had prior meetings with the witnesses that are inconsistent with their testimony."  Defs.' 2d Mot. to Compel 13.  Defendants do not clarify the inconsistencies to which they are referring.  The fact that the prosecutor may have called a witness's attention to something said in an interview is not an inconsistency.  The only inconsistencies the Court discerns are the disputes between the prosecutor and A.M.A. and J.B. as to what the prosecutor told them, not what the witnesses told the Government.

statements made by prosecutors in the presence of the grand jury when no witnesses were present, and the prosecutors' explanation of the law to the grand jury.  Defs.' 2d Mot. to Compel 16.  It is not clear if Defendants maintain their request to compel production of this material, but the Court will address it.

Grand Jury proceedings are intended to be secret.  *See Douglas Oil Co. of Cal. v. Petrol Stops Northwest*, 441 U.S. 211, 218 (1979) ("We consistently have recognized that the proper functioning of our grand jury system depends upon the secrecy of grand jury proceedings.").  This "secrecy principle" is codified in Rule 6(e) of the Federal Rules of Criminal Procedure, which "prohibits the disclosure of grand jury material except in the limited circumstances provided for in Rule 6(e)(3)."  *United States Aisenberg*, 358 F.3d 1327, 1346-47 (11th Cir. 2004).  Two circumstances are when disclosure is authorized by a  court "preliminarily to or in conjunction with a judicial proceeding" or "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."  Fed. R. Crim. P. 6(e)(3)(E)(i), (ii).  "[P]arties seeking disclosure must show: (1) 'that the material they seek is needed to avoid a possible injustice in another judicial proceeding'; (2) 'that the need for disclosure is greater than the need for continued secrecy'; and (3) 'that their request is structured to cover only material so needed.'"  *Aisenberg*, 358 F.3d at 1348 (quoting *Douglas Oil Co.*, 441 U.S. at 222).  The burden is on the party seeking grand jury material to "show a compelling and particularized need for disclosure."  *Id.*  Further, "there is a 'strong presumption of regularity accorded to the deliberations and findings of grand juries.'"  *United States v. Zamor*, 810 F. App'x 844, 845 (11th Cir. 2020) (per curiam) (quoting *United States v.*

*Molinares*, 700 F.2d 647, 651 n.6 (11th Cir. 1983)).  "No grand jury testimony is to be released for the purpose of a fishing expedition or to satisfy an unsupported hope of revelation of useful information."  *United States v. Valencia-Trugillo*, 462 F. App'x 894, 898 (11th Cir. 2012) (per curiam) (quoting *United States ex rel Stone v. Rockwell Int'l Corp.*, 173 F.3d 757, 760 (10th Cir.1999)).

Defendants contend they have shown a particularized need based on a pattern of prosecutorial misconduct in which prosecutors "crafted the evidence it wanted the case to represent" by threatening and making hidden promises of benefits to witnesses and misrepresenting the facts and law to the grand jury.  Hr'g Tr. 7:20-8:23.  As detailed above, the Court disagrees that Defendants have made such showing, including as to statements made by prosecutors during grand jury proceedings.  *See United States v. Fell*, No. 5:01-cr-12-01, 2016 WL 1621994, at *3 (D. Vt. Apr. 20, 2016) ("A defendant is not entitled to review the record of the grand jury proceedings to determine if he disagrees with points expressed in a closed proceeding by the prosecution.").

Nevertheless, the Court conducted an *in camera* review of the grand jury proceedings involving the two prosecutors about which Defendants have expressed the most concern.  The Court heard nothing in its review that raises concerns of prosecutorial misconduct.  Defendants' second motion to compel (ECF No. 110)—as supplemented (ECF No. 135)—is **DENIED**.

SO ORDERED, this 8th day of April, 2022.

/s/ Stephen Hyles
UNITED STATES MAGISTRATE JUDGE